UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MATTHEW DEROCHA,

        Plaintiff,

      v.                      5:22-CV-1344 (DNH/MJK)

JARED PETRIE, JUSTIN
BAUM, and JAMES DEAN,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                   OF COUNSEL:

MATTHEW DEROCHA
Plaintiff, Pro Se
6159 Crestview Drive
North Syracuse, NY 13212

SUGARMAN LAW FIRM LLP      PAUL V. MULLIN, ESQ.
Attorneys for Defendants        CORY J. SCHOONMAKER, ESQ.
211 West Jefferson Street       PAUL G. LYONS, ESQ.
Syracuse, NY 13202

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I.    INTRODUCTION

On December 14, 2022, *pro se* plaintiff Matthew DeRocha ("DeRocha" or

"plaintiff") filed this 42 U.S.C. § 1983 action alleging that the Town of DeWitt

Police Department (the "DeWitt PD") and defendants DeWitt PD Sergeant Jared Petrie ("Sergeant Petrie"), Officer Justin Baum ("Officer Baum"), and Officer James Dean ("Officer Dean") violated his constitutional rights on September 5, 2020, when officers arrested him and confiscated his vehicle from a local gas station. Dkt. No. 1. Along with his complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"), Dkt. No. 3, and for the appointment of counsel, Dkt. No. 4.

On January 20, 2023, U.S. Magistrate Judge Andrew T. Baxter granted plaintiff's IFP Application, denied his motion for counsel without prejudice, and, after conducting an initial review of the complaint, advised by Report & Recommendation ("R&R") that plaintiff's § 1983 excessive force / failure-to-intervene claims against the officers should survive initial review. Dkt. No. 5.

However, Judge Baxter advised that plaintiff's other claims should be dismissed with partial leave to amend (except as to the DeWitt PD itself, which Judge Baxter advised should be dismissed *with* prejudice). Dkt. No. 5. The Court adopted the R&R without objection on February 6, 2023. Dkt. No. 7. Thereafter, plaintiff filed an amended complaint. Dkt. No. 11.

On April 3, 2023, Judge Baxter reviewed the amended complaint and, as before, concluded that plaintiff's § 1983 excessive force / failure-to-intervene claims could proceed against Sergeant Petrie, Officer Baum, and Officer Dean (collectively "defendants"). Dkt. No. 12. Thereafter, defendants answered the

2

amended complaint, Dkt. No. 22, and the parties completed a lengthy period of discovery, *see, e.g.*, Dkt. No. 84.

On October 6, 2025, defendants moved for summary judgment on plaintiff's remaining § 1983 claims. Dkt. No. 87. Plaintiff sought, Dkt. No. 89, and received, Dkt. No. 91, an extension of the response deadline. Thereafter, plaintiff filed an "affidavit" with exhibits, Dkt. No. 92, a "response" in opposition, Dkt. No. 95, and a "status report," Dkt. No. 96. Defendants have also replied. Dkt. No. 93.

The motion will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND

The following facts are taken from defendants' statement of material facts, Dkt. No. 87-26 ("Defs.' Facts"), and, as discussed *infra*, are largely undisputed for the purpose of assessing defendants' motion for summary judgment.[1]

On September 5, 2020, at around 7:20 a.m., the store manager at Cliff's Local Market in DeWitt, New York, called the police to report that a suspicious person in the business's rear parking lot was rummaging through the gas station's dumpsters. Defs.' Facts ¶¶ 1, 8, 12. Officer Baum and Officer Dean,

---

[1] Defendants have filed some video footage. Dkt. Nos. 87-17, 87-18, 87-19. The Court's approach to this video evidence will be discussed *infra*.

along with a trainee officer, responded. *Id.* ¶ 13. Sergeant Petrie also responded to the call and arrived shortly after the others. *See id.* ¶ 14.

The three officers identified the suspicious person as plaintiff. Defs.' Facts ¶¶ 7, 14–15. At that time, they observed plaintiff in the rear of his parked vehicle looking at some scratch-off lottery tickets he had fished out of the dumpster. *Id.* ¶ 16. Officer Baum approached plaintiff and observed that he had "pinpoint pupils, appeared disheveled and sweaty, and was speaking to himself." *Id.* ¶ 17.

Officer Baum asked plaintiff for identification. Defs.' Facts ¶ 18. Plaintiff gave Officer Baum an expired driver's license. *Id.* Officer Dean, who was assisting with the investigation, noticed that plaintiff's vehicle contained "what appeared to be a significant amount of cut copper, and bolt cutters, in plain sight in the back seat" of plaintiff's car. *Id.* ¶ 19.

Based on the significant amount of copper in the vehicle, their collective knowledge of copper thefts in the area, plaintiff's impaired behavior, and the belief that plaintiff intended to try to drive off in his vehicle (despite his expired driver's license), Officer Baum decided to detain plaintiff. Dkt. No. 87-4 ("Crim. Trial Tr.") at 272–73. Officer Baum handcuffed plaintiff and walked him to the back of his patrol vehicle to put him in the rear seat. Defs.' Facts ¶¶ 22, 26; *see also* Ex. E to Baum Decl., Dkt. No. 87-18 ("Pole Cam"); Ex. F to Baum Decl., Dkt. No. 87-19 ("FWE Cam").

4

Plaintiff was agitated and did not want to be placed in the vehicle. *See* Pole Cam at 45:41–46:07; FWE Cam at 45:51–46:23.[2]  After a brief verbal exchange, plaintiff slouched down against the rear tire of the police vehicle to avoid being put into the back seat of the patrol car. *See id.*  Officer Baum was able to forcibly load plaintiff into the back of the vehicle anyway. *See id.*

Plaintiff, still agitated, began shifting and moving around inside the back of the patrol car, which "caused the vehicle (a patrol SUV) to rock back and forth."  Defs.' Facts ¶ 26; *see also* Pole Cam at 46:11–46:15; FWE Cam at 46:25–46:32.  Officer Baum opened the rear door, "at which time [plaintiff] slumped out of the vehicle and flailed on the ground."  Defs.' Facts ¶ 30.

The officers attempted to get plaintiff back into the patrol car but plaintiff initially resisted their efforts by, among other things, kicking his legs in the air, screaming, laying on the ground, and as plaintiff recalls, "bugging out" and moving his whole body around.  Defs.' Facts ¶¶ 31–34.

A review of the Pole Cam and FWE Cam broadly confirms this general series of events.  Officers Baum and Dean put leg restraints on plaintiff to try to obtain better control.  Defs.' Facts ¶ 36.  Eventually, the officers were able

---

[2]  The hardcoded timestamps on the video files are hard to make out because they are in white text against a partially matching background.  Timestamps used in this opinion match the runtime of the video file offered as the exhibit instead.

to get plaintiff back into the rear seat. *Id.* Plaintiff was charged with second-degree assault, resisting arrest, and second-degree harassment. *Id*. ¶ 43.

Plaintiff's state-court case on these criminal charges went to trial in April of 2022. Defs.' Facts ¶ 44. During the trial, plaintiff testified that he had resisted the officers' attempts to place him into the patrol car. *Id*. ¶ 32. He also testified that "[o]ne officer grabbed me by the face and said, '[c]alm the fuck down,' right by my face." *Id*. ¶ 38; *see also* Crim. Trial Tr. at 356:18–19 ("When he first put me in the car, he grabbed me by my face and told me to calm the fuck down."). Even so, plaintiff testified that none of the officers ever struck or hit him. Defs.' Facts ¶ 38. The jury found plaintiff guilty of resisting arrest. *Id*. ¶ 44.

This civil rights action followed.

## III.   LEGAL STANDARD

The entry of summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

6

The Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Id.* at 255. Even so, there is no genuine issue for trial "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (cleaned up).

## IV. DISCUSSION

### A. Threshold Matters

#### 1. Plaintiff's Pro Se Status

Plaintiff is unrepresented. Therefore, his pleadings, motions, and filings must be held to less stringent standards than those that might be drafted by a lawyer. *See, e.g.*, *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). As the Second Circuit has repeatedly explained, *pro se* filings must be "construed liberally" with "special solicitude" and interpreted to raise the strongest claims and arguments that they suggest. *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 519 (2d Cir. 2013). "This is particularly so when the *pro se* plaintiff alleges that his civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (cleaned up).

#### 2. Plaintiff's Opposition to Summary Judgment

Plaintiff has failed to properly oppose defendants' motion for summary judgment. As noted *supra*, plaintiff sought and received an extension of time in which to file an opposition. Dkt. No. 91. Even so, the only *timely* submission

that plaintiff has offered is an "affidavit" with exhibits. Dkt. No. 92. In this "affidavit," plaintiff offers an un-notarized statement:

> The material fact is I can prove and the defendants did [commit] (failure to intervene) by all three officers committed so by not stopping one another from violating my civil rights and not only but working together to do so by charging my Matthew DeRocha with false charges (assalt 2nd) a D felony (harrassment) and (resisting arrest) also created evidence cuts and made repores lied on them fabraction of evidence created evidence to send me to jail/prison to hurt me during the arrest my face was grabbed sqeesed and I was harrassed in the car in cuffs (use of force).

Dkt. No. 92 at 1–2 (errors in original). In support of this affidavit, plaintiff offers as exhibits police reports and photographs as well as placeholders for surveillance videos that were used at his state-court criminal trial. *See id.* at 3–24. After the deadlines expired and defendants replied, plaintiff also filed a "response" in opposition, Dkt. No. 94, a letter motion seeking relief related to an appeal of his state-court conviction, Dkt. No. 95, and a "status report" in which he states that his claim should not be dismissed, Dkt. No. 96.

To determine whether a trial is warranted, the summary judgment procedure puts the initial responsibility for identifying genuine disputes of material fact on the parties to the litigation. Briefly summarized, the party trying to avoid a trial (*i.e.*, the movant) must identify—in a document called the statement of material facts—the undisputed material facts that entitle them to judgment as a matter of law on the claim or defense at issue. N.D.N.Y. L.R.

8

56.1(a). In response, the party seeking to justify the need for a trial on that claim or defense (*i.e.*, the non-movant) is supposed to respond—in a separate-but-matching document—by admitting or denying each material fact offered by the movant. N.D.N.Y. L.R. 56.1(b). And for each denial, the non-movant is also supposed to identify the specific record evidence that creates a "genuine" dispute over that material fact. *Id*.

Plaintiff's only timely responsive submission—the "affidavit" with exhibits outline briefly above—does not conform with this Local Rule. Nor, for that matter, do the untimely submissions at Dkt. Nos. 94, 95, 96. Although plaintiff is *pro se*, unrepresented litigants are not exempt from procedural rules governing summary judgment. *See, e.g.*, *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003); *Edwards v. I.N.S.*, 59 F.3d 5, 8 (2d Cir. 1995).

That said, *pro se* litigants often struggle to craft an appropriate responsive submission on summary judgment.[3] So the reviewing court typically takes a function-over-form approach to what it has received. This can sometimes mean looking at the underlying record (at least what has been made available on the docket) to determine if a genuine dispute of fact exists. *See, e.g.*, *Holtz*

---

[3] Notably, however, plaintiff is an experienced *pro se* litigant who should certainly be aware of basic procedural rules. *DeRocha v. Syracuse Police*, 5:26-CV-699 (BKS/CBF); *DeRocha v. Syracuse Police Dep't et al.*, 5:26-CV-698 (MAD/MJK); *DeRocha v. Syracuse Police Dep't et al.*, 5:26-CV-697 (BKS/CBF); *DeRocha v. Syracuse Police*, 5:26-CV-696 (BKS/ATB); *DeRocha v. Crouse Hospital*, 5:21-CV-683 (MAD/ML), *DeRocha v. North Syracuse Police*, 5:18-CV-1052 (GLS/ATB), *DeRocha v. Syracuse Police*, 5:18-CV-1051 (BKS/ATB).

*v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (holding that district court "may in its discretion opt to conduct an assiduous review of the record"), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Importantly, however, Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (collecting cases).[4]  Instead, the reviewing court will typically focus its attention on the *pro se* litigant's incomplete or partial submissions and conduct a careful review of what has been offered to try to determine whether a trial might be warranted on any of the claims.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) ("In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally or factually appropriate.").

The Court will take that approach here.  First, the properly supported facts in the movant's statement of material facts—the ones that are not directly disputed by plaintiff's various filings or the available video footage—will be deemed admitted.  *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (cautioning that non-movant's failure to properly

---

[4]  Even in the absence of an opposition, courts should keep in mind that a verified complaint should be treated as an affidavit for summary judgment purposes. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  Plaintiff's amended complaint is verified.  *See* Dkt. No. 11.  Accordingly, the Court will review the non-conclusory factual assertions in that document *infra*.

oppose does not relieve burden of the ordinary burden of production); N.D.N.Y. L.R. 56.1(b).  Second, the materials offered by plaintiff—including his timely-but-unsworn "affidavit" as well as his other untimely filings made after the response deadline—will be reviewed to determine whether they create any genuine disputes of material fact warranting a trial.

### 3.    The Surveillance Footage

Defendants filed surveillance footage of this incident.  In *Scott v. Harris*, the Supreme Court made clear that video evidence can and should be considered in determining whether genuine material issues of fact exist.  550 U.S. 372 (2007).  As the Fifth Circuit has explained, *Scott* "empowers a district court to disregard testimony that is at odds with video evidence."  *Orr v. Copeland*, 844 F.3d 484, 491 (5th Cir. 2016).

Defendants relied on this footage, at least in some part, to support certain assertions in their statement of material facts.  Plaintiff, for his part, has also made repeated statements in his various filings indicating that this video evidence is directly relevant to his claims for relief.

A review of this footage shows that it broadly confirms the parties' version of events, *e.g.*, the officers encountered plaintiff at the gas station, he was acting somewhat erratically, they decided to detain him, he refused to enter the patrol vehicle, slumped to the ground on two occasions, and generally resisted repeated attempts to place him into the vehicle.

11

However, none of the available footage offers the kind of exact angles, close magnification, or other details that would be necessary to perfectly reconstruct this encounter. For instance, relevant portions of the video that might depict exactly what is happening seem to skip or freeze. Likewise, because the footage is from surveillance cameras rather than body camera footage (defendants testified that DeWitt PD had not yet deployed body cameras to them back in late 2020), there is no audio to accompany what is shown.

This is a recurring problem with video or surveillance evidence on summary judgment. After all, not every case will be like *Scott*, where the video evidence reduced one party's version of events to a "visible fiction." 550 U.S. at 381. More commonly, the video evidence will capture only part of the relevant events. Under those circumstances, courts should "resist the temptation to uncritically assume that video evidence inherently possesses a unique kind of 'reliable factual conclusiveness.'" *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 481 (N.D.N.Y. 2017).

In short, the Court has reviewed the available video footage and, to the extent that the video evidence depicts parts of the relevant events, will consider whether the footage tends to establish the presence or absence of any genuine disputes over the material facts that might be sufficient to warrant a trial.

12

## B. The Merits

Plaintiff's claims are brought under 42 U.S.C. § 1983. "Section 1983 creates a cause of action based on personal liability and predicated upon fault." *Loveall v. Walker*, 807 F. Supp. 3d 148, 158 (N.D.N.Y. 2025) (citation omitted). A § 1983 claim holds an individual personally liable for the role that his or her own acts or omissions played in violating someone's constitutional rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Accordingly, "to establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.45h 987, 996 (2d Cir. 2023) (cleaned up).

### 1. Excessive Force / Failure-to-Intervene

Plaintiff's § 1983 excessive force and failure-to-intervene claims are premised on the allegation in his amended complaint that one of the officers "choked" him and told him to "calm down" after they put him in the back seat of the patrol car. Dkt. No. 11 at 5, 6.[5]

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness' standard.'" *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018) (quoting *Brown v. City of N.Y.*, 798 F.3d 94, 100 (2d Cir.

---

[5] The amended complaint is not divided into paragraphs. The Court has cited the page numbers directly. Pagination corresponds with ECF headers.

2015)). Determining excessiveness "requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

Fourth Amendment reasonableness is an "objective" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Dancy v. McGinley*, 843 F.3d 93, 116–17 (2d Cir. 2016) (explaining that officer's motivation or subjective intent is irrelevant). This "objective reasonableness" standard is wide-ranging, *Barnes v. Felix*, 605 U.S. 73, 76 (2025), highly fact-specific, *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam), and requires the reviewing court to consider the "totality of the circumstances," *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

Importantly, though, "[c]ourts must be 'careful to evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)). "The continuum along which excessiveness of force in making an arrest is assessed is not marked by visible signposts." *Brown*, 798 F.3d at 103.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court endorsed a non-exclusive list of factors that should be taken into account as part of this balancing inquiry:

> (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect posed an immediate threat to the safety of the officer or others, (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

The Second Circuit has emphasized that *Graham*'s three-factor test governs in the context of a Fourth Amendment claim. *Cugini v. City of N.Y.*, 941 F.3d 604, 612 (2d Cir. 2019). But it has also indicated that other factors may be relevant in certain cases, such as "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016).

Measured against these general legal standards, and upon review of what the parties have made available to the Court for consideration on summary judgment, no reasonable jury could find in plaintiff's favor on his § 1983 excessive force or failure-to-intervene claims.

As an initial matter, plaintiff's various filings repeatedly complain that the officers engaged in conduct that is unrelated to his remaining claims. For instance, plaintiff complains that the officers lied or made false statements about whether he injured any of them. Dkt. No. 94. He also claims that the surveillance videos show that the officers fabricated evidence (in their police

15

reports) and that his state-court attorney tried to "blow" his state-court criminal trial. *See id.*

But plaintiff does not have any claims against his state-court attorney in this litigation. Nor does he have any false arrest or fabricated-evidence claims against the officers, which would likely be barred by his conviction at the state-court criminal trial anyway. Instead, all that is left in this litigation is plaintiff's § 1983 excessive force and failure-to-intervene claims against the officers.

To that end, the record evidence and available surveillance video footage both establish what plaintiff concedes: that he resisted officers' attempts to place him in the patrol car on <u>both</u> occasions, which means that on <u>both</u> occasions some non-zero amount of force—at least the amount necessary to effect the seizure of a resistant individual—was warranted as a matter of law. *See, e.g.*, *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000) ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force . . . . ").

To be sure, this was not some "license to use force without limit." *Sullivan*, 225 F.3d at 166. But there is nothing meaningful in the available record tending to show that any specific officer applied any more force than was necessary under the circumstances. The Pole Cam and FWE Cam footage show that, when plaintiff initially refused to enter the back seat of the police cruiser and slumped against the rear tire, Officer Baum struggled for a moment to get

16

plaintiff into vehicle.  Notably, this video evidence shows that Officer Baum was somewhat rough or forceful in the manner in which he secured plaintiff in the rear of the police vehicle on the first occasion.  But the video evidence does not give any indication that he punched, hit, kicked, choked, or grabbed or squeezed plaintiff at this time—he just loaded him into the back seat of the cruiser and quickly shut the door.

This video footage also shows that, on the second occasion when Officer Baum opened the door and plaintiff slumped his body outside the vehicle, it took the officers on the scene a few minutes to regain control of the situation and get plaintiff back inside the vehicle.  But the video evidence shows that the officers were actually fairly deferential to plaintiff's outburst—instead of aggressively trying to pick him up or manhandle him while he struggled, they stood around and waited until he finished his physical and verbal outburst before standing him up and loading him back into back seat of the cruiser.

There is no doubt from the available video footage (not to mention plaintiff's own versions of events, summarized below) that plaintiff was actively resisting the officers' efforts to get him into the police cruiser by, among other things, "bugging out" and flailing around on the ground during these events.

For instance, in his amended complaint plaintiff states that when the officers reopened the car door, he "slid out of the car and sat down on the ground where I could be scene started kicking and screaming for help because

17

he just charged me with harassment for no reason after a few minutes of a screaming for help they put me back in the police car and charged me with assault second resisting arrest and harassment[.]" Dkt. No. 11 at 5 (errors in original).

Likewise, in his deposition in this case, plaintiff testified to "being outside of the car screaming help because they're framing me and doing this, and shit to me." Ex. G to Lyons Decl., Dkt. No. 87-8 (Pl.'s Dep.") at 53:12–14. The Pole Cam and FWE Cam footage appear to confirm this version of events, although there is no audio of the footage to confirm plaintiff's verbal statements.

Plaintiff also describes a portion of the events captured on video in his untimely-filed response: "The officer's failed to stop one another from doing this witch if a violation of my rights and did so purposely to hurt me and it did caused me to go into panic that day and scream cry and yell help[.]" Dkt. No. 94 at 2 (errors in original). But this document appears to be focused more on accusing the officers of lying during the state-court criminal trial than on establishing how they used more force than was reasonably necessary under the circumstances. *See id.*

Recall that the only claims that remain in this litigation are § 1983 claims for excessive force and a failure to intervene. The only place plaintiff appears to offer any version of the relevant events that might at all be useful for purposes of avoiding summary judgment on his remaining § 1983 excessive

force claims—which were based on the amended complaint's initial allegation that one of the officers "choked" him and told him to calm down after they put him in the back seat of the patrol car—is in his un-notarized "affidavit," where he avers:

> The material fact is I can prove and the defendants did [commit] (failure to intervene) by all three officers committed so by not stopping one another from violating my civil rights and not only but working together to do so by charging my Matthew DeRocha with false charges (assalt 2nd) a D felony (harrassment) and (resisting arrest) also created evidence cuts and made repores lied on them fabraction of evidence created evidence to send me to jail/prison to <u>hurt me during the arrest my face was grabbed sqeesed</u> and I was harrassed in the car in cuffs (use of force).

Dkt. No. 92 at 1–2 (errors in original) (emphasis added).  In other words, viewed in the light most favorable to him, plaintiff appears to contend that one of the officers "hurt [him] during the arrest [when he] grabbed [and/or] [squeezed] [his face]." *Id*.  However, this isolated statement (which, again, does *not* assert that plaintiff was "choked" and fails to identify which defendant-actor allegedly engaged in this conduct) is insufficient to warrant a trial.

"A lot of the work district courts do is to filter what turn out to be meritless cases through an array of protective procedures to make sure that the rare meritorious case does not slip through with no remedy." *Jones v. Yazzo*, 481 F. Supp. 3d 109, 114 (E.D.N.Y. 2020).  Excessive force cases "will usually require the full array of those procedures, *i.e.*, a trial, to prevent that from happening."

19

*Jones*, 481 F. Supp. 3d at 114. But there are three reasons why that is not the case under the circumstances presented here.

First, despite what his amended complaint initially stated, at his sworn deposition in this case plaintiff did <u>not</u> testify that any defendant "choked" him inside the vehicle. Instead, he testified that, while he was engaged in what he characterized elsewhere as "bugging out," an "officer reached in the car and grabbed me and told me to, what is it, calm down or something like that." Pl.'s Dep. at 64:6–8. Defendants, for their part, also deny that any of them "choked" or "attempted to choke" plaintiff. Petrie Decl., Dkt. No. 87-9 ¶¶ 39–40; Baum Decl., Dkt. No. 87-13 ¶¶ 49 –52; Dean Decl., Dkt. No. 87-20 ¶¶ 32, 40–42.

Second, a brief exchange inside the vehicle with one of the officers can be seen on the FWE Cam and Pole Cam footage, but the angles or magnification are insufficient to show the details of this encounter. FWE Cam at 56:38–57:45; Pole Cam at 56:21–57:28. Notably, though, what this video does show is that plaintiff was still in an extremely agitated state at this time.

Thus, even crediting plaintiff's deposition testimony and his "affidavit" in opposition—that, while he was still "bugging out," an officer grabbed or squeezed him (perhaps his face, the story varies) and told him to "calm down" or even to "calm the fuck down"—no rational fact finder could find that this officer acted objectively unreasonably under the circumstances. *Barnes*, 605 U.S. at 80 (considering actions officer took to try "to control the encounter,"

20

such as "giving warnings"); *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."); *Antic v. City of N.Y.*, 273 F. Supp. 3d 445, 459 (S.D.N.Y. 2017) (rejecting excessive force claim based on defendant's one-armed push during a chaotic situation).

Third, plaintiff testified at his deposition that he did not sustain any injuries at all as a result of these events. Defs.' Facts ¶¶ 47, 49. According to plaintiff:

> Q. Give me one second to look through my notes. As a result of this incident and your arrest, did you sustain any physical injuries, bumps, bruises, breaks, anything like that?
>
> A. I have no idea.
>
> Q. Okay. And did you go to the hospital after?
>
> A. No I just went to jail. And I got out I was so happy. I can't even believe I got out.
>
> . . . .
>
> Q. How long were you in jail before you got let out?
>
> A. I think just 24 hours.
>
> Q. You didn't go the hospital or the doctor the next day?
>
> A. No.
>
> Q. Did you have any pain when you got let out of jail? No?

21

A. No. No just charges again for stuff you know.

Q. But nothing - - you didn't have any pain after?

A. No.

Q. You didn't see a doctor for physical complaints after you got let out of the jail?

A. No.

Q. All right. Just to confirm, you didn't have any physical injuries related to this?

A. I got out that day.

Q. Okay. But you did not have any physical injuries?

A. No, I didn't.

Pl.'s Dep at 55:23–57:8.

Although "the relevant legal analysis depends not on a particular quantum of injury but on a showing of the objective reasonableness of the conduct," *Moore v. Keller*, 498 F. Supp. 3d 335, 357 (N.D.N.Y. 2020), evidence of a plaintiff's injury (or lack of injury) is still relevant "because it is probative of the amount and type of force actually used by the arresting officers," *Rolkiewicz v. City of N.Y.*, 442 F. Supp. 3d 627, 645 (S.D.N.Y. 2020).

To summarize: the parties agree that plaintiff repeatedly resisted attempts to put him in the back seat of the police cruiser; defendants deny "choking" or "attempting to choke" him; plaintiff did not testify at his deposition that

he was "choked" by any of the officers; while he was admittedly "bugging out," plaintiff testified that an officer "grabbed" or "squeezed" him (perhaps his face) and told him to "calm down" or to "calm the fuck down"; the video footage does not show anything useful about this encounter; and plaintiff testified that he did not suffer any physical injuries at all as a result of all these events.

Viewed in the light most favorable to plaintiff, the non-movant, and even crediting plaintiff's claim that his face was grabbed or squeezed without any resulting physical injury, there is insufficient evidence from which a rational fact-finder could conclude that any named defendant violated plaintiff's constitutional rights under the circumstances presented here.[6]

In concluding that plaintiff's claim cannot go to a jury, the Court acknowledges that there is almost always going to be some lingering doubt about precisely what happened on a second-by-second basis in any police-citizen encounter. But because no "jury, instructed as to the relevant factors, could reasonably find that the force used was excessive," *Brown*, 798 F.3d at 103, defendants are entitled to summary judgment on plaintiff's § 1983 claims.

Finally, although in certain situations an officer who is a bystander to a constitutional violation can be held liable for a "failure to intervene," *see Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), the alleged violation in this

---

[6] In the alternative, the available record establishes that this would be the rare excessive force case in which qualified immunity would apply on summary judgment. *See Zorn v. Linton*, 146 S. Ct. 926 (2026).

case is premised on excessive force.  Because plaintiff's excessive force claims are being dismissed, plaintiff's failure-to-intervene claims—which are derivative of those excessive force claims—must be dismissed, too.

## V.   CONCLUSION

Viewed in the light most favorable to the non-movant, and even accounting for his *pro se* status, there is insufficient evidence in the available record from which a rational fact-finder could return a plaintiff's verdict.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment (Dkt. No. 87) is GRANTED; and

2. Plaintiff's letter motion (Dkt. No. 95) is DENIED.[7]

The Clerk of the Court is directed to terminate the pending motions, enter a judgment accordingly, and close the file.

IT IS SO ORDERED.

Dated:  July 16, 2026
           Utica, New York.

David N. Hurd
U.S. District Judge

---

[7]  In this letter motion, plaintiff complains that certain videos are not part of his counseled appeal of the state-court criminal conviction.  *See* Dkt. No. 95.  Because federal district court is not the place to make such a request, it is denied.

24